UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

MILTON GREEN                          CIVIL ACTION NO. 6:16-cv-01227

VERSUS                                JUDGE WALTER

U.S. COMMISSIONER,                    MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be reversed and remanded

for further administrative action.

## ADMINISTRATIVE  PROCEEDINGS

The claimant, Milton Green, fully exhausted his administrative remedies before

filing this action in federal court.  He filed an application for disability insurance

benefits and an application for supplemental security income benefits, alleging

disability beginning on in 2004.[1]  His counsel subsequently requested that the alleged

disability onset date be amended to October 1, 2012.[2]  His applications were denied.[3]

---

[1]     Rec. Doc. 7-1 at 167, 174.

[2]     Rec. Doc. 7-1 at 65-66, 130-132.

[3]     Rec. Doc. 7-1 at 107, 108.

He requested a hearing, which was held on December 17, 2014 before Administrative Law Judge Nancy M. Pizzo.[4] The ALJ issued a decision on March 12, 2015,[5] concluding that the claimant was not disabled within the meaning of the Social Security Act from December 1, 2004 through the date of the decision. The claimant asked for review, but the Appeals Council found no basis for review of the ALJ's decision.[6] Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on December 22, 1986.[7] At the time of the ALJ's decision, he was twenty-eight years old. He went to high school and received a graduate equivalency diploma ("GED")[8] but had no further schooling or training. He worked briefly in fast food restaurants and as an electrician's helper.[9] At the hearing,

---

[4]   The hearing transcript is found at Rec. Doc. 7-1 at 64-86.

[5]   Rec. Doc. 7-1 at 27-39.

[6]   Rec. Doc. 7-1 at 4.

[7]   Rec. Doc. 7-1 at 167, 174.

[8]   Rec. Doc. 7-1 at 66.

[9]   Rec. Doc. 7-1 t 192

he testified that the longest he had held a job was for about nine months in a bakery.[10]

His applications alleged that he has been disabled since December 1, 2004 due to a

bipolar disorder,[11] but his attorney argued at the hearing that his onset date should be

amended to October 1, 2012 due to a prior adjudication.[12]

The claimant was involuntarily hospitalized at River Oaks Hospital in New

Orleans, Louisiana from December 17, 2005 to December 21, 2005[13] on a physician's

emergency certificate. Although that hospitalization predated the revised disability

onset date, it is consistent with the claimant's subsequent hospitalizations. Upon

admission, the claimant exhibited psychotic behavior, flight of ideas, looseness of

association, and delusions. His delusional thoughts were grandiose and his auditory

hallucinations included his allegedly hearing "prophets." He had a disheveled

appearance; restless, agitated, grandiose psychomotor behavior; inappropriate,

anxious, and agitated mood and affect; and pressured, irrelevant speech. His thought

process was confused and disoriented, with loose associations, and grandiose flight

of ideas. He was residing with his mother, and he told an interviewer that his family

---

[10]     Rec. Doc. 7-1 at 69.

[11]     Rec. Doc. 7-1 at 87, 191.

[12]     Rec. Doc. 7-1 at 65-66, 130-132.

[13]     Rec. Doc. 7-1 at 245-265.

and his relationships with his family were stressors. His mother told doctors that the claimant's behavior had become more bizarre over the past several days, and that he had not been eating or sleeping, but had been rambling. The claimant admitted using marijuana, and he tested positive for that substance. It was noted that the claimant was an extremely poor historian. During the course of his hospitalization, his condition improved with Haldol and Cogentin. He was diagnosed with psychosis, NOS, and substance abuse, NOS. He was assigned a GAF score of 35 upon admission to the hospital, and he was assigned a GAF score of 49[14] upon his discharge from the hospital.

The record contains no treatment notes for the time period from December 2005 until September 2012. However, there is an indication that the claimant filed

---

[14] The Global Assessment of Functioning ("GAF") scale is used to rate an individual's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") at 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a person's emotional status. A GAF score in the range of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF score in the range of 41 to 50 indicates serious symptoms such as suicidal ideation or any serious impairment in social, occupational, or school functioning. The GAF scale was omitted from DSM–5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013). Although still used by many mental health professionals, GAF scores are not determinative of a claimant's ability to work. *Fuller v. Astrue*, No. 4:09-CV-197-A, 2010 WL 5566819, at *8 (N.D. Tex Oct. 13, 2010), adopted in 766 F.Supp. 2d 1149, 2011 WL 94549 (N.D. Tex. Jan. 11, 2011); *Andrade v. Astrue*, No. 4:11-CV-318-Y, 2012 WL 1106864, at *8 (N.D. Tex. Feb. 13, 2012).

an earlier application for Social Security benefits,[15] which explains the lack of medical evidence or other documentation during that time period.

The claimant was seen in the emergency room at Teche Regional Medical Center in Morgan City, Louisiana, on September 26, 2012.[16] He was anxious and animated with delusions or hallucinations including seeing dead people. These symptoms had begun a week and a half earlier. He was given Zyprexa, and his anxiety decreased. He was released with a prescription for chlorpromazine. The diagnosis was psychosis including auditory and visual hallucinations.

The claimant returned to the emergency room of Teche Regional Medical Center, on October 1, 2012,[17] with anxiety and psychosis. He was having delusions and auditory hallucinations in the form of voices telling him to kill himself. He gave no history and was very agitated and combative, making a physical examination difficult. A urine drug test for marijuana was positive. He reported that his symptoms began gradually and worsened over the preceding week earlier, and he was unable to fill his medications. His mood was described as anxious, suicidal, and depressed. His affect was animated. He was not oriented to time. He was having

---

[15]     Rec. Doc. 7-1 at 88.

[16]     Rec. Doc. 7-1 at 317-320.

[17]     Rec. Doc. 7-1 at 313-314, 319-320.

thoughts of suicide and planned to use a gun to shoot himself. His judgment and insight were impaired but his memory was normal. He was having delusions or hallucinations described as visions of dead people. He was given Ativan, Benadryl, Chlorpromazine, and Zyprexa, which decreased his anxiety. It was noted that he used alcohol, street drugs, and marijuana. The doctor concluded that he should be admitted for inpatient care. The preliminary diagnosis was major depression with suicidal ideation and psychosis.

On October 1, 2012,[18] the claimant was admitted to the behavioral health department of Teche Regional Medical Center for further evaluation and treatment. The admitting physician noted that the claimant had a long-standing history of depression, was very agitated and combative, and was experiencing auditory and visual hallucinations telling him to kill himself. The claimant was discharged on October 4, 2012, having been diagnosed with psychosis and substance disorder. It was noted that, upon his admission, he was disheveled and unkempt, bizarre, indifferent, agitated with intelligible speech, and anxious. An irritable mood, inappropriate affect, and loose associations were noted. He was not suicidal but he was possibly homicidal and having bizarre, grandiose delusions but no hallucinations. His memory, concentration, and judgment were impaired, and his insight was poor.

---

[18]     Rec. Doc. 7-1 at 311-312.

He tested positive for cannabis, and his potassium level was low. Upon admission, it was noted that he was endangering himself and threatening others. Upon discharge, the claimant had no homicidal or suicidal ideations, but remained illogical and less delusional with no signs or symptoms of detoxification noted. He was discharged with prescriptions of Haldol and Cogentin, and he was instructed to follow up at St. Mary Mental Health.

The claimant was seen at St. Mary Mental Health on October 9, 2012 by psychologist Lynn L. Guidry Ph.D. The claimant reported that he had seen and heard things since he was nine years old, including hallucinations involving his dead father. He admitted using alcohol and marijuana off and on. He stated that he did not fill the Haldol and Cogentin prescriptions from the hospital but indicated that he wanted to get on medication and get a job. Dr. Guidry's impression was that the claimant should be enrolled in outpatient treatment services. The claimant's long history of visual and auditory hallucinations, marijuana and alcohol abuse, and thinking disorder, as well as his noncompliant history were noted. It was also noted that the claimant was not a completely reliable informant. Dr. Guidry diagnosed the claimant with psychosis NOS and assigned a current GAF score of 56.[19]

---

[19] This indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

The claimant was seen at Magellan DCC (also known as St. Mary Mental Health) on October 12, 2012 by Nurse Practitioner Pamela Dupont. The claimant was obese and disheveled, but his affect was appropriate and his mood was euthymic. He reported no thoughts of harm to himself or others. It was indicated that his condition was much improved and his symptoms were mild.

On July 28, 2013,[20] the claimant was involuntarily admitted to Abrom Kaplan Memorial Hospital in Kaplan, Louisiana, on a physician's emergency certificate due to bizarre behavior and hallucinations. He was transferred to the behavioral health unit under the care of Dr. David Sauls. He was diagnosed with marijuana abuse, hypokalemia (low potassium), and elevated liver enzymes. The treatment notes indicate that the claimant was released from a different psychiatric unit on July 25, 2013 but the record contains no corresponding treatment notes. Dr. David Sauls conducted a psychiatric evaluation on July 20, 2013, while the claimant was taking Haldol and Ativan. Dr. Sauls noted that the claimant was morbidly obese. At that time, Dr. Sauls questioned whether the claimant actually had bipolar disorder or was malingering. He assigned a GAF score of 25.[21] Dr. Sauls's progress note of August

---

[20]     Rec. Doc. 7-1 at 283-307.

[21]     Indicative of behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.

1, 2013 indicated that discontinuing the Haldol led him to conclude that the claimant was not malingering, and he changed the diagnosis to bipolar disorder, manic, severe, not psychotic. He prescribed Haldol Decanoate and continued the Ativan. The claimant was discharged from the hospital on August 5, 2013 with a GAF score of 35.[22] At the time of discharge, the claimant had no suicidal or homicidal thoughts, hallucinations, delusions, obsessions, or compulsions. His mood was all right, his affect was stable and happy, and he was oriented. His ability to attend, his insight, and his judgment were fair. He was to continue his medications and follow up with Teche Action Clinic.

On August 9, 2013, the claimant was seen at the Teche Action Clinic in Franklin, Louisiana by Licensed Clinical Social Worker James Evans, IV.[23] The claimant reported that, before the recent hospitalization, he was manic and not sleeping. At this visit, he was "feeling balanced." He reported earlier mental health treatment and psychiatric hospitalizations. His mood was depressed and anxious. His affect was appropriate, his speech was normal, and his thought process was intact. He was not having hallucinations, delusions, suicidal ideation, or homicidal ideation.

---

[22]     Indicative of some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

[23]     Rec. Doc. 7-1 at 328-332.

The claimant was again seen at the Teche Action Clinic on December 24, 2013.[24] The treatment note indicates that the claimant had recently been hospitalized after missing a Haldol injection but received an injection earlier that month. He was well groomed and cooperative. His affect was appropriate, his mood and speech were normal, his thought process was intact, and he had no hallucinations, delusions, suicidal ideation, or homicidal ideation.

On March 31, 2014, the claimant was again seen at the Teche Action Clinic.[25] He complained of insomnia and reported that he had not been able to stay on his medications because he could not pay for them. He was relying on his church to pay for his medications and wanted to get back on them. The plan was to refill the medications (Haldol, Cogentin, and Ativan), return the next day for a Haldol D injection, and follow up in a month. The claimant was well groomed, cooperative, and calm. His affect was appropriate, and his speech and mood were normal. His thought process was intact. He was not experiencing hallucinations, suicidal ideation, or homicidal ideation.

---

[24]     Rec. Doc. 7-1 at 422-427.

[25]     Rec. Doc. 7-1 at 428-433.

On April 8, 2014, the claimant was admitted to Northlake Behavioral Health System in Mandeville, Louisiana, on a physician's emergency certificate.[26] The admitting diagnosis was bipolar disorder, not otherwise specified, with psychotic features. His GAF score was 25.[27] The treatment records indicate that the claimant was hospitalized because of noncompliance with his medications, pacing, decreased sleep, bizarre behavior, walking into his neighbors' homes, and eating cat and dog food. He had a right arm injury sustained when he punched a wall. His affect was manic and he exhibited grandiose, delusional behavior, describing himself as a rapper, actor, and co-creator of God. He stated that he acted up in the hospital to get famous on the internet. His thought process was disorganized and illogical. He also indicated that he had visual hallucinations of demons. He admitted having been noncompliant with his medication for the previous month. His judgment, insight, and impulse control were poor. He responded well to treatment and, at the time of discharge on April 14, 2014, the claimant was described as no longer posing a risk of harm to himself and others. His GAF score had risen to 45,[28] he was alert and fully

---

[26]     Rec. Doc. 7-1 at 340-356.

[27]     Indicative of behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.

[28]     Indicative of serious symptoms or any serious impairment in social, occupational, or school functioning.

oriented with no suicidal or homicidal ideation, and his insight and judgment were described as good. He was prescribed Haldol and Cogentin. He was to follow up with a local mental health clinic.

On July 10, 2014, the claimant was admitted to the Behavioral Medicine Center at Abbeville General Hospital in Abbeville, Louisiana for in-patient psychiatric services.[29] After he became assaultive, aggressive, and paranoid and could no longer be managed at home, his family had taken him to an emergency room at a hospital in Franklin, Louisiana. He was admitted involuntarily for acute in-patient psychiatric services for stabilization of his symptoms of explosive impulsive behavior, threatening behavior towards others, and impairment in overall perceptions. He had been noncompliant with his medication because his Medicaid had been discontinued. His symptom complex included active and ongoing threats of harm to others, increased paranoia and suspiciousness, marked disorganization in thinking, not sleeping, pressured speech, increased impulsivity, agitation, neglect of self care, and increasing irritability. He admitted that he was smoking cannabis daily. Alcohol use was also suspected. It was noted that the claimant had multiple prior in-patient psychiatric hospitalizations, poor compliance with medications, and poor compliance with out-patient treatment. He also had a history of prior incarcerations on drug

---

[29]     Rec. Doc. 7-1 at 359-385.

charges. There was no evidence of hallucinations and no suicidal ideation but he was exhibiting grandiose and paranoid thinking. His insight and judgment were poor. He had difficulty staying focused. The provisional diagnoses were (1) schizoaffective disorder, bipolar type versus bipolar affective disorder, manic with psychotic features, (2) cannabis use disorder, and (3) nonadherence to medication and treatment.

The next day, July 11, 2014, the claimant was examined by a treatment team. He was quite disorganized, quite bizarre in his overall presentation, and showed evidence of clear misinterpretation of events around him. His insight and judgment were deemed to be impaired. A treatment plan was developed.

On July 13, 2014, Dr. David Craft met with the claimant, who was confrontational at first but gradually became more comfortable. His behavior continued to be inappropriate and bizarre. His speech was rambling, his affect was flat, his thought processes were markedly disorganized with episodic flight of ideas. He was paranoid and suspicious, and his insight and judgment were deemed to be fair to poor. Dr. Craft attempted to educate him about cannabis use and the need to be compliant with his medications. Dr. Craft noted that the claimant had achieved an inadequate response to medication trials, and there was a risk for further deterioration of his condition. His medications were adjusted. Over the next few days, Dr. Craft continued to note that the claimant had an inadequate response to the medication

being administered, and medication adjustments were made.  On July 17, 2014, Dr. Craft noted that the claimant was approaching maximal hospital benefit, and he again adjusted his medication.  On July 18, 2014, the claimant appeared to be doing somewhat better.  At the team meeting, the claimant was urged to abstain from using cannabis and adhere to medication and treatment.  His thought processes had improved, there was no evidence of any intent to harm himself or others, and his insight and judgment remained limited but improving.  At the time of discharge on July 19, 2014, the claimant's speech was nonpressured, his affect was more appropriate than at the time of admission, his thought processes were more trackable and there were no suicidal ideations, homicidal ideations, or hallucinations.  It was noted that the claimant's family had not participated in family counseling sessions. Depakote and Seroquel were prescribed, and the claimant was referred for outpatient mental health services.  The discharge diagnoses were bipolar affective disorder, manic with psychotic features; cannabis use disorder; and nonadherence to medication and treatment.

The claimant was seen at the Teche Action Clinic on August 1, 2014.[30]  He had been without medication since his discharge from the hospital.  He was advised to

---

[30]     Rec. Doc. 7-1 at 436-441.

stay on his medications and keep his appointments.  The claimant returned to the Teche Action Clinic on August 6, 2014[31] and again on August 19, 2014.[32]

On September 10, 2014,[33] the claimant was admitted to the Allen Parish Hospital in Kinder, Louisiana by physician's emergency certificate due to several days of bizarre behavior, including wandering at night.  He had been found unresponsive in a bar and taken to a hospital emergency room.  He reported that he was in a bar drinking, took "a bunch" of Depakote and Seroquel, and woke up in the emergency room.  He also stated that he was banging his head on a car because someone paid him to do it.  He reported being depressed and not sleeping well, and said that he had used alcohol and THC as coping measures.  He reported racing thoughts, seeing things in his dreams, and anxiety.  He gave a history of prior psychiatric hospitalizations and legal problems.  Upon admission, he had a disheveled appearance, hyperactivity, labile mood and affect, anxiety, excessive speech, disorganized thought process, flight of ideas, auditory hallucinations, and delusions.

He was discharged on September 15, 2014, after improving somewhat during his hospitalization.  The claimant was worried that he would stop taking his

---

[31]     Rec. Doc. 7-1 at 442-447.

[32]     Rec. Doc. 7-1 at 448-450.

[33]     Rec. Doc. 7-1 at 401-416.

medications but "will try not to." The discharge diagnoses were bipolar disorder, mania with psychosis; and cannabis abuse. His GAF score was 43[34] on discharge. He was prescribed Abilify, Depakote, and Trazadone.

On September 18, 2014, the claimant was seen at Teche Action Clinic.[35] He reported a recent hospitalization following an accidental overdose on his medication and trouble with delusional thinking. At the appointment, he had no hallucinations, delusions, suicidal ideation, or homicidal ideation.

The claimant returned to the Teche Action Clinic on October 9, 2014.[36] He was feeling stable but reported some depression and anxiety.

On November 6, 2014, the claimant was again seen at the Teche Action Clinic.[37] He was disoriented and confused, and he admitted being noncompliant with his medication.

Four days later, on November 10, 2014, the claimant was admitted to Baton Rouge Behavioral Hospital, where he remained until discharged on November 18,

---

[34]     Indicative of serious symptoms or any serious impairment in social, occupational, or school functioning.

[35]     Rec. Doc. 7-1 at 451-454.

[36]     Rec. Doc. 7-1 at 455-460.

[37]     Rec. Doc. 7-1 at 461-464.

2014.[38] When his mental status was evaluated, the claimant could not sit still. He was disorganized, delusional, and grandiose. He had racing thoughts and bizarre behavior. He was in denial about his mental illness. His affect and mood were labile. He was restless and uncooperative as well as destructive. He was described as manic, racing around, and running in the halls. He laughed and talked to himself and interrupted others. He had poor impulse control and poor boundaries. He had auditory and visual hallucinations and delusions. He was paranoid about his medications, and opined that his medications were fake. His perceptions and reports were not reliable. He denied suicidal or homicidal ideation. He reported smoking marijuana and synthetic marijuana daily and occasionally using alcohol and ecstasy.

The claimant was admitted to the hospital and a twelve-step program for cannabis abuse and stimulant abuse. He was started on Seroquel for psychosis. The Depakote started in the emergency room was continued in a lower dose, and he was given trazadone. He was diagnosed with schizoaffective disorder bipolar type, most recent episode manic; cannabis dependence, synthetic and regular type; cocaine abuse

---

[38]     Rec. Doc. 7-1 at 392-400.

in full remission; history of alcohol abuse; and stimulant abuse. He GAF score was 35;[39] his highest GAF score over the past year was estimated to be 50 to 55.[40]

The claimant was seen at the Teche Action Clinic on November 12, 2014.[41]

On December 17, 2014, the claimant testified at a hearing regarding his symptoms and his medical treatment. He stated that his mental health issues started when he was seventeen years old. He testified that he has racing thoughts, hears voices – "something inside of me starts to speak to me" (Rec. Doc. 7-1 at 78), – and imagines things that are not actually there. He stated that he gets mixed up with religion, gets mixed up with books, imagines that his father (who is deceased) is talking to him, and thinks that he hears angels, demons, and spirits. He stated that he sometimes does not remember the things he says and does when his mental problems surface. He confirmed that he has been fired from several jobs and has been hospitalized several times for mental health treatment. He confirmed that the longest he had held a job was his position as a baker for a cinnamon roll company that he held for about nine months. He admitted that he used marijuana "for medicating my

---

[39]     Indicative of some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

[40]     Indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning.

[41]     Rec. Doc. 7-1 at 465.

mind" and to quiet the voices "talking to me in the inside of me" (Rec. Doc. 7-1 at 72). He stated that he had stopped drinking alcohol and denied using synthetic marijuana, cocaine, and ecstasy. The claimant stated that he depended on relatives and food stamps for financial support.

On June 16, 2015, the claimant was admitted to Calcasieu Oaks Behavioral Center in Cameron, Louisiana, on a physician's emergency certificate.[42] The physician's statement indicates that the claimant had demonstrated increasingly bizarre behavior during the three days preceding June 15, including walking into strangers' homes and laying in their beds. He also threatened suicide. He was agitated and delusional and was having auditory hallucinations. His drug screen was positive for cocaine, amphetamines, and marijuana. His alcohol level was .211. The claimant reported that his aunt had called the police because he was drunk and arguing with her. During his initial mental health status examination, he was disheveled, guarded, and hyperactive. His affect was blunted, and his mood was irritable. He was having auditory hallucinations and persecutory delusions. He was placed on medications, and he improved over the course of his hospitalization. He was discharged from the hospital on June 23, 2015 with prescriptions for Abilify, Divalproex, Folic Acid, Omeprazole, Sentry, and Vitamin B-1. The discharge

---

[42]     Rec. Doc. 7-1 at 17-20.

diagnoses were schizophrenia, paranoid type; and polysubstance abuse.  His GAF

score upon discharge was 57.[43]

The claimant now seeks reversal of the Commissioner's adverse decision.

## ANALYSIS

### A.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited

to determining whether substantial evidence supports the decision and whether the

proper legal standards were used in evaluating the evidence.[44]  "Substantial evidence

is more than a scintilla, less than a preponderance, and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion."[45]  Substantial

evidence "must do more than create a suspicion of the existence of the fact to be

established, but 'no substantial evidence' will only be found when there is a

'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[46]

---

[43]    Such a GAF score indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

[44]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[45]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[46]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[47]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[48]  Conflicts in the evidence[49] and credibility assessments[50] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[51]

## B.    ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and

---

[47]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[48]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[49]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[50]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[51]    *Wren v. Sullivan*, 925 F.2d at 126.

disabled, regardless of indigence.[52]  Every individual who meets certain income and

resource requirements, has filed an application for benefits, and is determined to be

disabled is eligible to receive Supplemental Security Income benefits.[53]

A person is disabled "if he is unable to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than twelve months."[54]  A claimant is disabled only

if his physical or mental impairment or impairments are so severe that he is unable

to not only do his previous work, but cannot, considering his age, education, and

work experience, participate in any other kind of substantial gainful work which

exists in significant numbers in the national economy, regardless of whether such

work exists in the area in which the claimant lives, whether a specific job vacancy

exists, or whether the claimant would be hired if he applied for work.[55]

---

[52]     See 42 U.S.C. § 423(a).

[53]     42 U.S.C. § 1382(a)(1) & (2).

[54]     42 U.S.C. § 1382c(a)(3)(A).

[55]     42 U.S.C. § 1382c(a)(3)(B).

## C.  EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[56] "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[57]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[58] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[59]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[60]

---

[56]  20 C.F.R. § 404.1520.

[57]  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[58]  20 C.F.R. § 404.1520(a)(4).

[59]  20 C.F.R. § 404.1545(a)(1).

[60]  20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[61] This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[62] If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[63]

## D.   THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since December 1, 2004.[64] This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments: schizophrenia, mood disorder, anxiety disorder, substance use disorder, and obesity.[65] This finding is supported by substantial evidence in the record.

---

[61]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[62]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[63]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[64]     Rec. Doc. 7-1 at 29.

[65]     Rec. Doc. 7-1 at 29.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[66]  The claimant challenges this finding.

The ALJ found that the claimant has the residual functional capacity to perform a full range of work at all exertional levels work except for the following nonexertional limitations:  no fast paced production requirements; routine workplace changes; simple directions/instructions/work-related decisions; and occasional direct interaction with the public, coworkers, and supervisors.[67]

At step four, the ALJ found that the claimant is not capable of performing any past relevant work.[68]

At step five, the ALJ found that the claimant was not disabled from December 1, 2004 (the alleged disability onset date) through March 12, 2015 (the date of the decision) because there are jobs in the national economy that he can perform.[69]  The claimant challenges this finding.

---

[66]     Rec. Doc. 7-1 at 30.

[67]     Rec. Doc. 7-1 at 31.

[68]     Rec. Doc. 7-1 at 37.

[69]     Rec. Doc. 7-1 at 39.

### E.    THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred (1) in failing to find that he is entitled to a period of disability; (2) in failing to find that his impairments meet or equal the criteria of a listed impairment; and (3) by failing to properly evaluate his obesity.

### F.    DID THE ALJ ERR IN FAILING TO FIND A PERIOD OF DISABILITY?

The claimant contends that the ALJ erred in failing to award benefits for a period of disability. In a closed period case, the Commissioner determines that a new applicant for disability benefits was disabled for a finite period of time that started and stopped prior to the date of his decision.[70] In this case, however, the claimant did not argue that he was disabled only for a specific period of time; he argued instead that he continues to be disabled. Therefore, this case is not suitable for the determination of a period of disability. Furthermore, the claimant did not identify any particular time period for which he should have been granted disability benefits. Therefore, awarding a closed period of disability would be inconsistent with the remainder of the claimant's arguments.

In cases involving a closed period of disability, the ALJ must make two critical decisions. First, the ALJ must find that the claimant was disabled for a period of

---

[70]    *Joseph v. Astrue*, 231 Fed. App'x. 327, 329 (5th Cir. ) (citing *Waters v. Barnhart*, 276 F.3d 716, 719 (5th Cir. 2002)).

time; second, the ALJ must apply the medical improvement standard to determine when the payment of benefits should be terminated. Here, however, the claimant did not argue that he was previously but is no longer disabled. Instead, he contended that the his most recent hospitalization in 2015 "debunk[ed] the notion that medical improvement may have occurred."[71] Although the claimant is correct that the burden would rest with the government to show that the claimant's disability ended as of the cessation date[72] if this were a closed period case, the Commissioner has no such burden in this case because the claimant did not establish entitlement to a period of disability. Accordingly, this argument lacks merit.

## G. DID THE ALJ ERR IN FAILING TO FIND THAT THE CLAIMANT'S IMPAIRMENTS MEET OR EQUAL A LISTING?

The claimant argued that the ALJ erred in failing to find that his impairments meet or equal a listing. This Court agrees that there is a lack of substantial evidence supporting the ALJ's conclusion at step three of the requisite analysis.

The ALJ concluded that the claimant does not meet the criteria of Listings 12.03 – schizophrenic, paranoid, and other psychotic disorders, 12.04 – affective disorders, 12.06 – anxiety-related disorders, or 12.09 – substance addiction disorders

---

[71]     Rec. Doc. 8 at 7.

[72]     *Waters v. Barnhart*, 276 F.3d at 718.

– because the "paragraph B" criteria for each of these listings are not satisfied. Implicit in the ALJ's ruling is a finding that the paragraph A criteria for these listings is satisfied, and that finding is consistent with the information set forth in the treatment notes of the physicians who cared for the claimant during his multiple hospitalizations. The paragraph B criteria for each of the disorders requires marked restrictions in at least two of the following areas: (1) activities of daily living; (2) maintaining social functioning; and (3) maintaining concentration, persistence, or pace. Alternatively, paragraph B is satisfied if the claimant has experienced repeated episodes of decompensation, each of extended duration, which means at least three episodes within a year, each lasting for at least two weeks.[73]  In this case, the ALJ found that the claimant had mild restrictions in activities of daily living, marked difficulties in social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and "one or two" unidentified episodes of decompensation.

The ALJ's conclusion concerning the claimant's restriction in the area of activities of daily living can be reached only by ignoring the function report filled out by the claimant's mother, Marsha Green.[74]  In her report, Ms. Green stated that the claimant spends his days watching TV and playing games, and that she has to "let him

---

[73]     20 C.F.R., pt, 404, subpt. P, appx. 1, § 12.00(C)(4).

[74]     Rec. Doc. 7-1 at 202-209.

know it's time for his personal needs and grooming." While she stated that the claimant can prepare simple meals for himself and can do some work around the house, she has "to give him encouraging words for him to do it." She also noted that the claimant was fired several times because "his mind wasn't right" and that he does not handle stress well and usually "ends up in the hospital." In his own function report, the claimant denied having any difficulties with personal care or household tasks, but as repeatedly noted in the record, the claimant is a poor historian.[75] To conclude that the claimant has only mild restrictions in activities of daily living, the ALJ also had to ignore the numerous references in the record to the claimant's disheveled appearance, which generally accompanied his episodes of decompensation. When admitted to Teche Regional Medical Center in October 2012, for example, it was noted that "[t]he patient is not performing his activities of daily living," and he was described as "disheveled and unkempt." Certainly, the record demonstrates that the claimant was, on some occasions when seen by health care professionals, appropriately groomed. However, the repeated deteriorations in his mental status documented in the record were usually accompanied by a corresponding deterioration in attention to activities of daily living. Therefore, the ALJ's conclusion

---

[75]      See, e.g., Rec. Doc. 7-1 at 253.

that the claimant has only mild restrictions in this category is not supported by substantial evidence in the record.

The ALJ's conclusion that the claimant had only "one or two" episodes of decompensation is also not supported by substantial evidence in the record. In the twelve-month period from July 28, 2013 to July 28, 2014, the claimant was hospitalized three times due to psychotic breakdowns. The claimant was hospitalized for nine days from July 28, 2013 through August 5, 2013; he was hospitalized for seven days from April 8, 2014 through April 14, 2014; and he was hospitalized for ten days from July 10, 2014 through July 19, 2014. Similarly, the claimant was hospitalized four times during calendar year 2014 due to decompensation – for seven days from April 8, 2014 through April 14, 2014; for ten days from July 10, 2014 through July 19, 2014; for six days from September 10, 2014 to September 15, 2014; and for nine days from November 10, 2014 through November 18, 2014. The claimant was also hospitalized four times between mid-June 2014 and mid-June 2015 – for ten days from July 10, 2014 through July 19, 2014; for six days from September 10, 2014 to September 15, 2014; for nine days from November 10, 2014 through November 18, 2014; and for eight days from June 16, 2015 through June 23, 2015. While there is no evidence that the claimant was ever hospitalized for fourteen consecutive days at a time, each of his hospitalizations was preceded by a

deterioration in his mental health, which likely meant a decompensation period of two weeks in duration each time. More than "one or two" periods of lengthy decompensation are documented in the record.

Further, the ALJ did not identify the "one or two" periods of decompensation that she credited, nor did she explain why any of the other episodes of psychosis that required the claimant to be hospitalized did not constitute periods of decompensation meeting the regulatory definition. Therefore, the ALJ's finding that the claimant did not have a sufficient number of episodes of compensation to support a finding that his condition satisfied the paragraph B criteria of the cited listings is not supported by substantial evidence in the record.

Moreover, the regulations do not require a strict adherence to the two-week rule but allow instead for a judgment call when equivalence to a listed impairment is being evaluated. "If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence."[76] The ALJ did not explain why the claimant's multiple hospitalizations, covering time periods of one to two weeks in length, are not sufficient to find that his mental health impairment is

---

[76]     20 C.F.R., pt, 404, subpt. P, appx. 1, § 12.00(C)(4).

equal to a listing without specifically satisfying all of the criteria of a listing. Therefore, the ALJ's finding of a lack of equivalence at step three is not supported by substantial evidence.

In summary, this Court finds that the ALJ erred in evaluating whether the claimant's mental health condition meets or equals a listed impairment.

The ALJ also found that "the claimant is clearly not making an appropriate effort to mitigate the symptoms of his conditions."[77] In reaching this conclusion, the ALJ focused on two concepts. She noted that the claimant's condition improved when he was given medications in the controlled environment of a hospital, and pointed out that a person is not disabled if his condition can be controlled by medication.[78] The ALJ also noted the claimant's repeated lack of adherence to a medication regimen and out-patient treatment following his release from the hospital, emphasizing that an ALJ may consider the failure to comply with treatment as an indication of non-disability.[79] The ALJ failed to point out, however, that a claimant's failure to follow prescribed medical treatment will preclude an award of benefits only

---

[77] Rec. Doc. 7-1 at 37.

[78] See *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988).

[79] See *Villa v. Sullivan*, 895 F.2d at 1024.

if the claimant lacks a good reason for failing to comply.[80]  One such "good reason" might be an inability to pay for the recommended treatment.[81]  "[T]he medicine or treatment an indigent person cannot afford is no more a cure for his condition than if it had never been discovered."[82] On more than one occasion, the record indicates that the claimant failed to fill his prescription medications because he could not afford to do so, even requesting that his church members assist him in that regard. Additionally, non-compliance that results from a mental impairment may be a justifiable reason for failing to follow prescribed treatment.[83]  This is particularly relevant here because the treatment notes indicate that the claimant's paranoia makes him suspicious of the medications he was prescribed and because he testified at the hearing that he uses marijuana as a means of quieting the voices he hears in his head. The ALJ also referred to the claimant's continued use of alcohol and drugs as

---

[80]     20 C.F.R. § 416.930; *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990).

[81]     SSR 16-3p, 2016 WL 1119029, at *8-9.  *Villa v. Sullivan*, 895 F.2d at 1024 ("although a condition that can be remedied by treatment is not disabling, a person unable to afford such treatment is considered disabled.  See *Lovelace v. Bowen*, 813 F.2d at 59; *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986).").

[82]     *Lovelace v. Bowen*, 813 F.2d at 59.

[83]     See *Burns v. Astrue*, 5:07-CV-182-C ECF, 2008 WL 2191303, *4-5 (N.D. Tex. May 27, 2008); *Brashears v. Apfel*, 73 F.Supp.2d 648, 651 (W.D. La. 1999) (citations omitted); *Grossweiler v. Barnhart*, No. SA-02-CA-903-RF, 2003 WL 22454928 at *2 (W.D. Tex. Sept. 30, 2003) (acknowledging that "'federal courts have recognized that a mentally ill person's noncompliance with psychiatric medications could be the result of [the] mental impairment and, therefore, neither willful nor without a justifiable excuse.'") (citations omitted).

evidence that the claimant is not trying hard enough to mitigate his symptoms.  But the ALJ failed to evaluate whether the claimant would be disabled by his conditions even if he were not using marijuana and other substances.[84]  Accordingly, the ALJ's reliance on the claimant's noncompliance with treatment recommendations as a basis for denying his application for benefits is not supported by substantial evidence in the record and indicates that the ALJ failed to apply the appropriate legal standards in evaluating the claimant's impairments.

This Court will, therefore, recommend that this matter be remanded for a new determination as to whether the claimant's impairments meet or equal a listing.

## H.  DID THE ALJ ERR IN EVALUATING THE CLAIMANT'S OBESITY?

The claimant's argued that the ALJ erred in failing to articulate the restrictions caused by the claimant's obesity.  The ALJ found that the claimant's obesity is a severe impairment; therefore, the ALJ should have also addressed the limitations resulting from that severe impairment.  The claimant complains that another case supporting such a finding was submitted to the Appeals Council but omitted from the record.  But the claimant did not attach a copy of that case to his briefing or direct this

---

[84]     20 C.F.R. § 404.1535 describes the process for determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability.

Court's attention to any statutory or jurisprudential authority for this argument. Accordingly, this Court finds that this assignment of error lacks merit.

## CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to reevaluate whether the claimant's mental health condition meets or equals the criteria of a listed impairment. The claimant should be permitted to submit updated medical records and to testify at another hearing. It is also recommended that the Commissioner have the claimant's mental health evaluated by a psychiatrist or psychologist familiar with the criteria of Listings 12.03, 12.04, 12.06, and 12.09. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[85]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of

---

[85] See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[86]

Signed in Lafayette, Louisiana, this 22nd day of December 2017.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[86]     See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).